IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case Number 1:15-CR-00175 |
| | : | |
| Plaintiff, | : | Judge James S. Gwin |
| | : | |
| vs. | : | **DEFENDANT'S RESPECTFUL** |
| | : | **SENTENCING MEMORANDUM** |
| AMY BELZ, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

Now comes Defendant Amy Belz (hereinafter "Amy"), by and through undersigned counsel, Michael C. Hennenberg and Justin Withrow, and pursuant to Fed. R. Crim. P. 32(i)(4)(A), 18 U.S.C. § 3553, the advisory United States Sentencing Guidelines (hereinafter "U.S.S.G."), and LCrR 32.2, respectfully and humbly moves this Honorable United States District Court to consider the below law, allocution and arguments of counsel and thereafter, consistent with the parsimony, and order a sentence of eight months home confinement, forty-eight months' probation and $232,407.48 in restitution.

Respectfully submitted,

/s/ Michael C. Hennenberg
MICHAEL C. HENNENBERG (0007882)
 Of Counsel
Dinn, Hochman & Potter, LLC
JUSTIN WITHROW (0088424)
5910 Landerbrook Drive, Suite 200
Cleveland, Ohio 44124-6500
(b) (440) 544-2000
(f) (440) 544-2002
E-mail:  Mike@Hennenberglaw.com
            Justin@Hennenberglaw.com
Counsel for Defendant

# TABLE OF CONTENTS

I.  Amy's Respectful and Unequivocal Acceptance of Responsibility ....................... 4

II.  How Restitution was Calculated ................................................. 5

III.  Full Restitution Payment Prior to Amy Being Charged .............................. 5

IV.  Dr. James Eisenberg, Ph.D., ABPP, Forensic Psychologist Report .......................... 7

V.  Where the Money Went ...................................................... 11

VI.  Amy, a 34-Year Old Married Mother of Two Children is a True Criminal
History I with Zero Points ...................................................... 12

    A. Personal Background ...................................................... 13
    B.  Professional Background .................................................. 14

VII.  Amy:  Wife and Mother of Two Young Daughters .......................................... 14

    A.  Family Letters ...................................................... 14
    B.  Friends ...................................................... 16

VIII.  Amy's Expressions of Shame and Remorse ................................................ 17

    A.  Family Letters ...................................................... 17
    B.  Amy's Friends ...................................................... 18

IX.  Amy's Volunteer Work with the Michael Gregory Belz Foundation ........................ 19

X.  A Guidelines Sentence Would Create an Unwarranted Disparity for
Similarly Situated Offenders ...................................................... 19

    A. The Commission's Sentencing Data of Post-Booker 18 U.S.C. 641
        Offenders Supports a Below Guideline Sentence .................................... 21
    B.  The Commission's 2010-2014 Fiscal Year Sentencing Data of
        Criminal History Category I Females with a Final Offense Level of
        17, Sentenced Under 2B1.1 Supports a Below Guideline Sentence .................... 21
    C. The 2B1.1Amendment, Effective November 1, 2015, Would Reduce
        Amy's Guideline Calculation by Two Levels .................................... 22

XI.  Fed. R. Crim. P. 32, Sentencing and Judgment (Allocution) ........................ 23

XII.  Conclusion and Wherefore ...................................................... 23

2

## TABLE OF EXHIBITS

| | | Page |
|---|---|---|
| **Exhibit 1** | **Acceptance of Responsibility Statement** | **4** |
| **Exhibit 2** | **Amy's OPERS Account Balance Statement** | **5** |
| **Exhibit 3** | **Michael C. Hennenberg Trust/IOLTA Check No. 5673** | **5** |
| **Exhibit 4** | **Forensic Psychologist Dr. James Eisenberg's July 13, 2015 Report** | **11** |
| **Exhibit 5** | **Forensic Psychologist Dr. James Eisenberg's Curriculum Vitae** | **11** |
| **Exhibit 6** | **Where the Money Went Data Spreadsheet and Pie Charts** | **12** |
| **Exhibit 7** | **Family Photograph** | **14** |
| **Exhibit 8** | **Letter of Brian Belz** | **14, 17, 19** |
| **Exhibit 9** | **Letter of Mary Lynn Reifschneider** | **15, 17** |
| **Exhibit 10** | **Letter of David Reifschneider** | **15, 18** |
| **Exhibit 11** | **Letter of Laura Reifschneider** | **15, 18, 19** |
| **Exhibit 12** | **Letter of Eileen Belz** | **15, 19** |
| **Exhibit 13** | **Letter of Mary A. Kast** | **16, 18** |
| **Exhibit 14** | **Letter of Deborah A. Damas** | **16, 18** |
| **Exhibit 15** | **Letter of Becky Santoro** | **17, 18** |
| **Exhibit 16** | **2005-2014 18 U.S.C. § 641 Sentencing Analysis Report** | **21** |

**MEMORANDUM**

## I.  Amy's Respectful and Unequivocal Acceptance of Responsibility

On  June 9, 2015, Amy, by and through undersigned counsel, respectfully submitted her precise and remorseful written statement to the United States Probation Department accepting, without equivocation, full responsibility for her wrongful conduct.

> I would like to begin by unequivocally accepting responsibility for my wrongful and illegal conduct.  I know that I was wrong and that I violated the law. I am a hardworking woman, wife and mother.  By violating the law I have totally failed to set a good example for my two (2) girls. I am extremely remorseful for letting my family, community and Government down.

> From 2008 through September 16, 2014, while employed as the Program Manager for the Parma Public Housing Agency, without authorization I wrote approximately 138 checks to myself from the Parma Public Housing Authority's PNC and Huntington Bank accounts totaling $232,407.48 and deposited them into my personal bank accounts at Huntington Bank and Fifth Third Bank.  This conduct was wrong, illegal and I have no one else to blame but myself.

> I am going to spend the rest of my life trying to regain the respect and trust of my family, community, and friends, and hope to once again become a person whom others see as a respectful and law abiding person.

> I know that I have violated the law and accept complete and unequivocal responsibility for my conduct.  I have learned and continue to learn many valuable life lessons as a result of my wrongful and illegal conduct that brought me into the criminal justice system.

> I know that I have to be punished and I assure my Government and this Honorable Court that I will never again repeat the conduct which led to my prosecution, and promise that I will be a law abiding person for the rest of my life. I wish to conclude by saying that I pleaded guilty because I am guilty and accept complete and unequivocal responsibility for the conduct that lead to my prosecution.

(Please see  Amy's  Sentencing  Memorandum  Exhibit  1,  Acceptance  of  Responsibility Statement.)

## II.    How Restitution was Calculated

Undersigned counsel advises that Amy and her accountant father, David Reifschneider, vigorously worked with undersigned counsel in furtherance of analyzing every 2008 – 2014 check deposit into her Huntington Bank and Fifth Third Bank checking accounts to precisely determine her restitution amount.

The Huntington and Fifth Third Bank management teams assisted undersigned counsel's analysis and ultimately provided seven years of bank statements.

After each bank statement was analyzed, the Huntington and Fifth Third Bank management teams continued their assistance by providing copies of every requested check that Amy deposited into her checking account.

Once provided with a copy of each deposited check, Amy, her father, and undersigned counsel calculated Amy's restitution amount.

Co-counsel Justin Withrow thereafter met with the Government and it was agreed that the restitution amount was $232,407.48.

## III.    Full Restitution Payment Prior to Amy Being Charged

Amy, by and through undersigned counsel, respectfully advises that she has functionally made full restitution, however, payment cannot be made until ordered by this Honorable Court.

In addition to voluntarily forfeiting the $106,854.22 in her OPERS pension account for restitution, on April 7, 2015, Amy, by and through undersigned counsel, presented the Government with a signed copy of Michael C. Hennenberg Trust/IOLTA check number 5673, signifying the additional funds provided to undersigned counsel by Amy's family for full restitution (Please see Amy's Sentencing Memorandum Exhibit 2, OPERS Account Balance Statement and Sentencing Memorandum Exhibit 3, Michael C. Hennenberg Trust/IOLTA Check No. 5673).

Attorney Withrow communicated extensively with Laura Parsons, Esq., Legal Counsel, OPERS, and was advised by Attorney Parsons that Ohio law does not permit OPERS to release Amy's pension account funds for restitution without a court order. However, the Government acknowledges that Amy was fully funded to make full restitution prior to being charged in the above-captioned matter.

In the Northern District of Ohio's *U.S. v. Robson*, 1:07-CR-267, 2007 WL 4510259 (N.D. Ohio Dec. 18, 2007), Robson pleaded guilty to one (1) count of 18 U.S.C. § 1344, Bank Fraud and his Presentence Investigation Report indicated an adjusted offense level 13, criminal history category I, yielding a range of 12 – 18 months.

However, the District Court varied downward three (3) levels following Robson's full restitution payment prior to being charged with a crime and sentenced him to one day incarceration and three (3) years of supervised release with the first six (6) months on home detention with electronic monitoring and work release privileges.

In *U.S. v. Demonte*, 25 F.3d 343 (6th Cir. 1994), the Sixth Circuit affirmed in part and reversed in part the District Court's three (3) year probation and no imprisonment term sentence. In reversing the District Court's six (6) level departure on the grounds that the defendant liquidated virtually of his assets to make restitution, the Sixth Circuit held that the defendant's actions were not voluntary, rather court ordered and after adjudication of guilty.  However, the *Demonte* court did "acknowledged that voluntary restitutionary payments may constitute "exceptional circumstances"" that justify a downward variance.  In his Opinion, concurring in part and dissenting in part, Judge Celebrezze stated,

> "[A] defendant ... should be judged by his actions. The fact that he may have some economic means should neither be held for him or against him. To suggest that when a defendant is affluent, his attempts at restitution can never qualify as an exceptional circumstance is as repugnant to equal protection ideology as to hold the lack of ability to make restitution against an indigent

6

defendant. It is clear that in some cases, the methods by which a defendant makes restitution may qualify as an exceptional circumstance, above and beyond what is considered in the Guidelines."

In *U.S. v. Kim,* 364 F.3d 1235 (11th Cir. 2004) the Eleventh Circuit, citing the 6th Circuit's *Demonte* decision, downward departed from a 15-27 months guideline range and imposed sentences of probation with six (6) months in-home detention where the defendants dipped significantly into their life savings and voluntarily undertook debt to pay restitution.

In *U.S. v. Davis*, 797 F.Supp. 672 (N.D. Ind. 1992), the Northern District of Indiana District Court downward departed eight (8) levels from the defendant's adjusted base offense level of sixteen (16) to a total offense level eight (8) finding that a large amount of pre-paid restitution constituted "super-acceptance of responsibility".

In departing the eight (8) additional levels for the loss amount, the District Court in *Davis* held,

> "The court finds that departure from the Guideline range is warranted because **the defendant's acceptance of responsibility is present to a degree substantially in excess of that which ordinarily is involved in the offense of conviction, as manifest by his payment of an extensive amount in restitution…The court finds such a large amount of pre-paid restitution is a circumstance which is highly unusual**, and is present in this case to a degree substantially in excess of that which ordinarily is involved in sentencing considerations for similar convictions…Although the defendant's restitution was no paid in full prior to the issuance of the indictment, the court finds that **his extraordinary amount of restitution does constitute "super-acceptance of responsibility" which warrants a departure** (emphasis added)."

## IV. Dr. James Eisenberg, Ph.D., ABPP, Forensic Psychologist Report

On June 25, 2015, Amy voluntarily presented herself to Forensic Psychologist James R. Eisenberg, Ph.D., ABPP, 161 North State Street, Painesville, Ohio 44077, (216) 314-4864, who evaluated, clinically interviewed, and administered the Minnesota Multiphasic Personality Inventory, 2nd edition (MMPI-2).

7

On July 13, 2015, Dr. Eisenberg provided undersigned counsel with the attached report which describes that Amy:

**a.**    **has no prior criminal history**;

Ms. Belz has no criminal history.  She reported one speeding ticket (36 mph in a 25 mph zone) and one ticket for rolling through a stop sign.

**b.**    **fully accepted responsibility for her wrongful conduct;**

. . . There is no history of violence or aggression, and she has accepted full responsibility. . .

c.    **"feels total shame and humiliation for what she has done to herself and her family;"** and

. . . She now feels total shame and humiliation for what she has done to herself and her family. . .

d.    **has a risk assessment of the "lowest" likelihood for recidivism**.

. . . Contemporary research on risk assessment for such an individual would place her in the lowest likelihood for recidivism.  It is doubtful that she would repeat anything like this in the future.

Dr. Eisenberg's July 13, 2015 report further states, in pertinent part:

Ms. Amy Belz is a 34-year-old married female referred to me for a psychological evaluation following a guilty plea to one count of Theft of Government Property in violation of Title 18 U.S. Code § 641.  The evaluation took place on June 25, 2015 and consisted of a clinical interview, review of records, and the administration of the Minnesota Multiphasic Personality Inventory, 2nd edition (MMPI-2). . .

**Sources of Information**

The following sources of information were reviewed and taken into consideration in the preparation of this report:

1.    Plea agreement with the U.S. District Court.

2.    Results of the MMPI-2.

3.    A documentation of the Parma Public Housing Check Summary itemizing the fraudulent checks.

4.      A copy of the Federal Sentencing Table.

5.      Investigation Questionnaire for the U.S. Probation Officer.

6.      Letter from Cindy Kaufman, LISW-S, dated June 23, 2015.

**Background Information**

Amy Belz was born on November 17, 1980 to Mary and David Reifschneider.  Ms. Belz has an older brother, Bradley, and a younger sister, Laura.  Ms. Belz attended a private Catholic school through the 8th grade and then entered Parma High School in the 9th grade, graduating in 1999.  While in high school, she participated in a number of sports including softball, basketball, and volleyball.  She was a member of SCEC (Student Council for Exceptional Children). She helped provide various services and activities for children who were developmentally handicapped or presented with intellectual deficiencies.

. . . Ms. Belz attended Kent State University and then Cleveland State University, taking courses in finance and accounting.  She did not graduate.

She started dating her husband, Brian, in 2000 and they were married in 2005.  They have two children, Kylie (age 8) and Kacie (age 5).  She stated that the majority of their time is spent with family and friends.  She said that they have rarely had a babysitter.

Ms. Belz speaks fondly of her family and the support that she has always had from them including her current situation.  She reported a very positive family experience and continues to have their support.

**Employment History**

While still in high school, Ms. Belz worked at Marc's as a cashier and at the Parma City swimming pool in the summer of 1999.  She later umpired softball games in 2000, waitressed at the Old River Yacht club in Edgewater, and at Clares in the Chapel Hill Mall.  From 2004-2005, she worked for Express in Strongsville, Ohio assisting customers in wardrobe selection.

From 2001-2014 she worked as a Program Manager for the City of Parma with responsibilities for determining housing eligibility, rent allocations, quality control inspections, monthly utilization reports, and client management.  She had a second job (2004-2005) with Express in Strongsville assisting customers.  She was terminated from her employment with the City of Parma in 2014 due to the instant offense.

From 2014 to 2015 Ms. Belz worked for the Limited and with Keith Wright, State Farm Insurance. . .

9

**Ms. Belz's Discussion of her Criminal Activity**

Ms. Belz worked at the Parma Public Housing Agency from July of 2001 to September of 2014.  She stated that she always resented her boss because she believes that she had to do double the amount of work because he was rarely there, even though he was making $85,000 to $90,000.  She stated that she was handling nine-five percent of the responsibilities yet was only earning $40,000. She stated that there was part of her that liked her boss (they both spoke often about their children) and then there was the part that hated him.  She said that he was very flexible about her schedule because of her children.  But as a boss, she never respected him because she claimed that he never did anything.  She stated that she does not blame him for turning her in.

She stated that when she wrote the first check to herself in 2008, "I thought I deserved it."  She stated that there was never a rhyme or reason for the amount of the checks.  She stated, "As much as I knew it was wrong, I could convince myself that it was ok."  She stated that she had no idea that she had spent that much money.  Her family was not in financial difficulty.  She said that most of the money was spent on usual household items, clothing, and things for the children.  She was surprised that the amount came to $232,000. . .

**Factors Relevant for Sentencing**

In my opinion, with reasonable psychological certainty, the following factors are relevant with regard to her sentencing.

First of all Ms. Belz has no prior criminal record.  She has no drug or alcohol history other than that as a social drinker.  Her co-workers describe her as someone who was dedicated in her work and kept the agency running smoothly. She had a highly stressful job managing some 800 families eligible for either public housing or housing vouchers.  It was her responsibility to provide both good news to those families who were eligible and bad news to those families who were no longer eligible for assistance.   She stated that she received threatening phone calls from the families that lost their assistance.  According to Ms. Belz, her supervisor provided little support for her.

Regarding the specific criminal complaint, Ms. Belz stated that she was frustrated and angry with her supervisor.  She believed that she was very much underpaid given her level of responsibility.  She stated that her supervisor was rarely there and that she handled both her as well as his responsibilities.  She had requested raises.  He suggested that she bill for overtime, but she was not eligible given her position.  As her anger mounted she wrote the first check to herself.  As there were no negative consequences initially, she continued to write checks to herself up to the time of her termination.  It appears that the motivation for writing the checks was anger, not necessarily personal gain.  A review of her expenditures shows no indication of any extravagant spending.  She was not able to explain the amounts that she wrote.  There appears to be no particular reason for the amounts.

Psychological testing is quite consistent with Ms. Belz' presentation.  She is open, non-defensive, and honest about her fraudulent behavior.  She accepts responsibility for this and testing does not indicate any attempt to feign or manipulate the results.  Though I would not render a diagnosis, as there is no indication of mental illness, perhaps "shame" is the most applicable description of her overall psychological functioning.

Ms. Belz has benefitted from individual therapy with Ms. Kaufman.  She has kept every appointment.

It is my understanding (based on conversations with her attorneys) that Ms. Belz, with the help of her family and friends, has made full restitution of $232,000.

In summary, Ms. Belz appears to be a relatively healthy and normal young woman who became quite frustrated and angry with the circumstances of her work.  She acted out on her anger by writing the checks to herself.  She certainly does not present as a typical criminal, if there is such a thing.  There is no underlying pathology that would explain her conduct (antisocial personality disorder, drug addiction, gambling).  There is no history of violence or aggression, and she has accepted full responsibility.  She used bad judgment and thought she would not get caught.  She now feels total shame and humiliation for what she has done to herself and her family.  Contemporary research on risk assessment for such an individual would place her in the lowest likelihood for recidivism.  It is doubtful that she would repeat anything like this in the future.

(Please see Amy's Sentencing Memorandum Exhibit 4, Dr. James Eisenberg's July 13, 2015 Report and Amy's Sentencing Memorandum Exhibit 5, Curriculum Vitae).

## V.     Where the Money Went

Undersigned counsel's analysis of Amy's Huntington and PNC Bank checking account statements for the entire offense period corresponds with Dr. James Eisenberg, Ph.D., ABPP's July 13, 2015 report which provides in pertinent part:

". . . that most of the money was spent on usual household items, clothing, and things for the children. . ."

Specifically, between 2008 – September 2014, Amy and Brian Belz earned $437,311.20 in total net income, however, spent $642,864.71.  Among the money spent, **Amy incurred**

11

**$33,802.02 ($417.31 per month) in overdraft fees.**  In addition to the overdraft fees, the money was spent on:

- **Mortgage and Utility Bills** = $278,981.91 - $3,444.22 per month;
- **Automobile Gasoline** = $36,275.27 - $447.84 per month;
- **Groceries** = $45,044.19 - $556.10 per month;
- **Restaurants/Takeout** = $38,739.05 - $478.26 per month;
- **Household & Family Spending (including but not limited to medical expenses and children's activities)** = $182,232.11 - $2,249.78 per month; and
- **ATM Withdrawals** = $27,790.16 - $343.09 per month.

(Please see Amy's Sentencing Memorandum Exhibit 6, Where the Money Went Pie Charts).

## VI.   Amy, a 34-Year Old Married Mother of Two Children is a True Criminal History I with Zero Points

In both *Rita v. United States*, 127 S.Ct. 2456 (2007) and thereafter in *Gall v. United States,* 128 S.Ct. 586 (2007) the Court reiterated that a District Court must act independently of the Guidelines and give due deference to the factors set forth in 18 U.S.C. § 3553(a).  Moreover, simply because a departure is disfavored under the Guidelines is not sufficient reason to discount it as a variance under § 3553(a).  *United States v. Aitoro*, 446 F.3d 246, 255 fn. 9 (1st Dist. 2006) ("After *Booker*. . . the fact that a factor is discouraged or forbidden under the guidelines does not automatically make it irrelevant when a court is weighing statutory factors apart from the guidelines.")

In *Pepper v. U.S.* 131 S.Ct. 1229 (2011), the Court emphasized the need for individualized sentencing, reiterating "the principle that 'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011), quoting *Williams v. New York*, 337 U.S. 241, 247 (1949).

Therefore, the sentencing court must first calculate the advisory Guidelines range, however, the mandatory 18 U.S.C. § 3553(a) parsimony principle necessarily overrides the Guidelines whenever there is a conflict. *See United States v. Kennedy*, 554 F.3d 415 (3rd Cir.

2009) ("Sentencing is not a mathematical calculation; it is a human enterprise that requires wisdom, judgment, and old-fashioned common sense. To the extent the plain language of the Guidelines-including its Commentary and Application Notes-would lead to unfair results, we repose our confidence in district judges to apply fairly and justly the factors set forth in 18 U.S.C. § 3553(a), which may require variances from the Guidelines range.")

18 U.S.C. §3553(a) advises that a District Court shall consider the below seven (7) factors:

(1)     The nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     The purposes of sentencing [as set forth above];

(3)     The kinds of sentences available;

(4)     The kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;

(5)     Any pertinent policy statement issued by the Sentencing Commission;

(6)     The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     The need to provide restitution to any victims of the offense.

Should the District Court judge be sufficiently convinced that a particular argument deserves consideration in determining the type and extent of a sentence, the District Court must provide sufficient justification for its decision, balancing the extent of justification and explanation with the proposed degree of the variance.

### A. Personal Background

On November 17, 1980 Amy was the second of three children born to David and Mary Lynn Reifschneider.  Amy and her sister, Laura Reifschneider, age thirty (30), were raised in Parma, Ohio and to this day, continue to enjoy their close, supportive and loving relationships.

13

In 1999, Amy graduated from Parma High School, wherein she was in honor's classes her junior and senior years.  Thereafter, Amy attended classes at Kent State and Cleveland State Universities until she accepted a City of Parma job.

Amy and Brian Belz have been married for ten (10) years and three (3) months and are the parents of two (2) daughters; Kylie, age 8, and Kacie, age 5.  (Please see Amy's Sentencing Memorandum Exhibit 7, Family Photograph).

       **B.**      **Professional Background**

From July 2001 to September 16, 2014, Amy was employed by the City of Parma as a Program Manager.  Amy lost her job as a result of the instant offense.  Thereafter, she worked in retail and for State Farm Insurance and lost both jobs following her disclosure of the instant offense.

**VII.**    **Amy:  Wife and Mother of Two Young Daughters**

Below are quoted excerpts from letters written by Amy's family and friends, addressed to the Court, in support of Amy as a wife and mother.

       **A.**      **Family Letters**

**Brian Belz, Husband**:

> ***. . . The children could not ask for a better friend or a more caring loving mother she is always there for them.***

Prior to meeting Amy, I was unmotivated and had a horrible relationship with my family.  I just didn't care about anything or anyone.  Amy took the time to show me how wonderful life could be, she was always there for me through thick and thin.  I am   confident that if I did not meet Amy when I did I would not be where I am today, she has made such an impact on my life. . .

. . . She is the glue that holds this family together day in and day out.  Amy is my best friend and the best wife any one could ask for we are all so lucky to have her in our lives.

(Please see Amy's Sentencing Memorandum Exhibit 8, Brian Belz letter.)

**Mary Lynn Reifschneider, Mother**:

> ***. . . The girls are both in school now, Kylie is in second grade and doing
> extremely well, Kacie is in pre-school and doing very good also. . .***

Amy has the two daughters, age 8 and 5, who are our only two grandchildren.
They are extremely special to us, as they are to Amy and Brian. They have always
been very well cared for.  I started babysitting them two days a week as soon as
Amy went back to work after her maternity leave.  There has never been any
doubt that she is a very good mother.
. . . Amy has always worked full time, but the kids and the house have never been
neglected.  Her house is always very tidy, the kids always have clean clothes. She
has always been very strict with them as far as homework, and bedtime. . .

(Please see Amy's Sentencing Memorandum Exhibit 9, Mary Lynn Reifschneider letter.)

**David Reifschneider, Father:**

> ***. . . The children have always been well taken care of and Amy has always taken
> pride on keeping the kids and her home neat and clean. . .***

Amy has a loving family of her own, a husband and two daughters who we adore.
Her children are very well behaved and the oldest granddaughter has excelled in
school with advanced level classes in only the second grade. . .

(Please see Amy's Sentencing Memorandum Exhibit 10, David Reifschneider letter.)

**Laura Reifschneider, Sister:**

. . . Amy and her husband Brian have blessed me with two beautiful nieces, Kylie
and Kacie. The girls light up a room as soon as they enter it!  Amy and Brian have
instilled manors, respect and gratitude. The girls are very caring, thoughtful and
appreciative. I recently tore my ACL and had knee surgery.  Kylie and Kacie were
extremely loving and helpful during a tough time. . .

(Please see Amy's Sentencing Memorandum Exhibit 11, Laura Reifschneider letter.)

**Eileen Belz, Mother-in-Law:**

> ***. . . Her family and their well-being are top priority in her life. . .***

Amy grew up in a home where faith and family were a big part of her life, and I
have seen this carry on into her married life and the raising of their girls.  Faith
and a religious education for their children are part of their daily lives. . .

(Please see Amy's Sentencing Memorandum Exhibit 12, Eileen Belz letter.)

**Mary A. Kast**, **Aunt through marriage:**

 *. . . Daily she nurtures, teaches and provides the stability of a loving mother. . .*

. . . Brian and Amy married in 2005 at St. Charles Church in Parma and began building their life with each other and with all of us too. We are a family that supports and celebrates each member through every birthday and holiday, in good times and in sad times . . .

Amy and Brian now have two beautiful, happy, loving girls, ages 5 and 8, who are the result of Amy's selfless, total devotion to their growth and well-being and their strong family environment. . . They laugh and play as a family. Both Amy and Brian have always had employment and responsibly provided a safe, happy home. . .

(Please see Amy's Sentencing Memorandum Exhibit 13, Mary A. Kast letter.)

B.     **Friends**

**Deborah A. Damas, Grade School friend:**

 *. . . Amy provides continuous care and great parenting skills in raising her children to be good in any situation. . .*

. . . Amy is a loving and caring mother, wife, daughter, sister and friend. She is very respectful and shows compassion and helpfulness to others. l have witnessed these qualities when we have been at their home, family functions and fundraisers.

Amy's children, Kylie and Kacie, are well taken care of by Amy and Brian. They are respectful and fun loving children. . .

(Please see Amy's Sentencing Memorandum Exhibit 14, Deborah A. Damas letter.)

**Becky Santoro, friend of eight (8) years:**

 *. . . Amy and her husband work together to raise their kids with love, discipline, and moral values - and it shows. They are raising remarkable, loving, and respectful girls. . .*

. . . Over the years I became very close to Amy and her family. Amy is a loving and dedicated wife and mother, everything Amy does revolves around her family. I have seen Amy juggle her schedule to accommodate the many committees she volunteered for at St. Ambrose where her oldest daughter attends school, and Wishing Well, where her youngest daughter goes to preschool. Amy unselfishly gives her time to her church/school community which she belongs, but most importantly she gives her time to be involved in

her children's lives. Amy has also logged countless volunteer hours to establish a cancer foundation for brain tumors in her brother- in-laws memory. This foundation has been a support to several families going through the same fateful journey Amy and her family endured. . .

Over the past 16 years I have watched a lot of children, and I have to admit Amy's family is definitely my favorite family. They have always shown me and my family the utmost respect and tremendous appreciation. We have developed such a special relationship, we have become family. Over these years of babysitting I have seen many parents put their needs before their children, Amy is not one of those parents. Amy and her husband continually put their children first. . .

(Please see Amy's Sentencing Memorandum Exhibit 15, Becky Santoro letter.)

## VIII.  Amy's Expressions of Shame and Remorse

### A.  Family Letters

As discussed in Dr. Eisenberg's July 13, 2015 Report, Amy has expressed "total shame and humiliation" for what she has done to herself, her husband and their two (2) daughters. Additionally, Amy has expressed her shame and remorse to her family and friends, to wit:

**Brian Belz, Husband**:

. . . Amy has expressed how horrible she feels for what has happened.  ***Not a minute of any day goes by that she is not remorseful***.  She understands what was done and wishes everyday she could go back in time and change everything. . .

(Please see Amy's Sentencing Memorandum Exhibit 8, Brian Belz letter.)

**Mary Lynn Reifschneider, Mother**:

. . . I know that ***Amy is extremely sorry for what she has done***, but she will need much more professional help to work through this situation. . .

(Please see Amy's Sentencing Memorandum Exhibit 9, Mary Lynn Reifschneider letter.)

**David Reifschneider, Father:**

. . . My wife and I have provided substantial financial assistance to Amy's restitution and would not have done so if he thought she would not ***accept responsibility for her actions and get the proper professional help and care needed to get through this case***. . .

I know she realizes the burden she has placed on everyone associated with this case and wants to show everyone that she can be a better person. . .

(Please see Amy's Sentencing Memorandum Exhibit 10, David Reifschneider letter.)

**Laura Reifschneider, Sister:**

. . . I truly believe Amy did not realize the magnitude and longevity of her actions. I know in her heart, she thought she was providing for her family. She has accepted her wrongful conduct and is taking the necessary steps to move forward. She has sought help from a professional therapist, their church Pastor and her primary care physician. She is also surrounded by the loving support from both her and her husband's families and friends. . .

(Please see Amy's Sentencing Memorandum Exhibit 11, Laura Reifschneider letter.)

**Mary A. Kast**, **Aunt through marriage:**

. . . Amy has spoken with me as ***she processes her remorse*** over these past legal events.  ***It is her first thought and last thought every day, and every moment in between is consumed with doing everything possible to be forthcoming to resolve these issues***. . . She has sought the counsel of her Catholic Priest and she is participating in sessions with a medical professional. . .

(Please see Amy's Sentencing Memorandum Exhibit 13, Mary A. Kast letter.)

**B.      Amy's Friends**

**Deborah A. Damas, Grade School friend:**

. . . Amy is sorry for her actions and has stated such.  ***She is devastated and continues to be apologetic***.

(Please see Amy's Sentencing Memorandum Exhibit 14, Deborah A. Damas letter.)

**Becky Santoro, friend of eight (8) years:**

. . . ***Amy is truly regretful for the decisions she has made that put her in this situation***. . . I know deed in my heart from conversations we have had she is truly, truly sorry.

(Please see Amy's Sentencing Memorandum Exhibit 15, Becky Santoro letter.)

## IX.    Amy's Volunteer Work with the Michael Gregory Belz Foundation

At age 30, Amy's brother-in-law, Michael Belz, passed away due to brain cancer.  Prior to and since Michael's passing, Amy has become involved in volunteering her time to the Michael Gregory Belz Foundation and helping other families affected by a cancer diagnosis.

**Brian Belz, Husband**:

. . . my brother Michael was diagnosed with a brain tumor…he passed in 2009…Amy, as well as some of my other family members decided to create a non-profit organization for brain cancer and brain tumor patients…It was a top priority for Amy because she saw what it did to our family and wanted to help. . .

(Please see Amy's Sentencing Memorandum Exhibit 8, Brian Belz letter.)

**Laura A.  Reifschneider**, Amy's sister, writes:

Dear Judge Gwin:

. . . Amy has also volunteered a lot of her spare time over the past five plus years honoring the legacy of her husband Brian's brother, Michael Belz.  Mike lost his battle to brain cancer at the young age of 30.  Much of the Belz family has contributed to the success of the Michael Gregory Belz Foundation (MGBF).  This includes organizing annual events at the Gathering Place, Dining for Hope, and the Annual Golf Outing.  Amy continues to help spread awareness throughout the community, while helping other cancer patients and their families who are going through extremely difficult situations. . .

(Please see Amy's Sentencing Memorandum Exhibit 11, letter of Laura A. Reifschneider.)

**Eileen Belz, Mother-in-Law:**

Amy…offered to help in the start of a family foundation in memory of our son to help other brain tumor/cancer patients and their families.  Amy is on the Board of this foundation.  Much time and love is put into this effort.

(Please see Amy's Sentencing Memorandum Exhibit 12, Eileen Belz letter.)

## X.    A Guidelines Sentence Would Create an Unwarranted Disparity for Similarly Situated Offenders

Amy pleaded guilty to one (1) count of 18 U.S.C. §641 and is accountable for a $232,407.48 loss.  The United States Attorney's Office included a stipulated guidelines

computation in the plea agreement and both sides agree it is the correct computation. In that guideline computation Amy's offense is scored according to U.S.S.G. §2B1.1, she has a final offense level of 17 and a guideline sentencing range of 24 to 30 months.

18 U.S.C. §3553(a)(6) directs that the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" be considered when imposing sentence. Furthermore, this mandate, to avoid unwarranted sentence disparities, was the primary impetus for the creation of the Federal Sentencing Guidelines.

The United States Sentencing Commission continues to underscore the need to avoid unwarranted sentencing disparity and stated in its 2007 Annual Report:

> The *guidelines are intended to promote fairness* through the establishment of sanctions proportionate to the severity of the crime and *the avoidance of unwarranted disparity by setting similar penalties for similarly situated offenders*.
>
> Disparity in sentencing has long been a concern for Congress, the criminal justice community, and the public.

U.S. Sentencing Comm'n, 2007 Annual Report, Chapter 1 p. 1. (Emphasis added.)

The United States Sentencing Commission (hereinafter "the Commission") maintains a comprehensive, computerized data collection system of federal sentencing information pursuant to 28 U.S.C. §994(w), each chief judge of a district is required to ensure that within 30 days after entry of judgment in a criminal case, the sentencing court submits a report of sentence to the Commission that includes: (1) the judgment and commitment order; (2) the statement of reasons (including the reasons for any departures); (3) any plea agreement; (4) the indictment or other charging document.

## A. The Commission's Sentencing Data of Post-*Booker* 18 U.S.C. 641 Offenders Supports a Below Guideline Sentence

Between January 12, 2005 (post *Booker*) and September 30, 2014 there were 4,154 cases in which an individual was found guilty of 18 U.S.C. § 641 and no other statute. **82.8% of these cases received a sentence of probation with an average probation length of 35.4 months and average imprisonment sentence of 1.6 months.**

Within Amy's loss range of $200,000 and $400,000, 125 cases were sentenced. **The average probation sentence was 42.3 months and the average imprisonment sentence was 11 months.**

**The Northern District of Ohio sentenced only one 18 U.S.C. § 641 offender** with a loss amount between $200,000 and $400,000 **and imposed 8 months home confinement and 48 months' probation**.

In that case, the female defendant was sentenced in January 2011 and responsible for a loss of $221,474.00. Her guideline range was 18 – 24 months and the reasons given for her below guideline sentence were – 18 U.S.C. § 3553(a)(1) nature and circumstances of the offense, 18 U.S.C. § 3553(a)(2)(A) to reflect the seriousness of the offense, and to avoid unwarranted sentencing disparities (Please see Sentencing Memorandum Exhibit 16, 2005-2014 18 U.S.C. § 641 Sentencing Analysis Report).

## B. The Commission's 2010-2014 Fiscal Year Sentencing Data of Criminal History Category I Females with a Final Offense Level of 17, Sentenced Under 2B1.1 Supports a Below Guideline Sentence

An analysis of the Commission's sentencing data from the fiscal years 2010 through 2014[1], shows there were 343 female, Criminal History Category I, final Offense Level 17, defendants. Further analysis provides:

---

[1] A copy of the spreadsheets from which the above-statistics were compiled has been provided to the Government.

- **The average incarceration sentence was 12 months;**

- **The median incarceration sentence was 12 months;**

- **A sentence of 24 months would be greater than 71.3% of all sentences imposed;**

- **112 of the 343 individuals received no prison time;**

- **190 of the 343 individuals received a year-and-a-day or less;**

- **252 of the 343 individuals received a departure or variance for any reason (including 5K1.1) for an average downward departure/variance of 19 months and median of 24 months; and**

- **When focusing on only court-initiated variances, 125 out of 343 received such variances for an average downward variance of 17 months and a median of 18 months.**

**C. The 2B1.1Amendment, Effective November 1, 2015, Would Reduce Amy's Guideline Calculation by Two Levels**

On April 9, 2015 the Commission affirmatively voted to amend the Guidelines' monetary tables to account for inflation.  The 2B1.1 amendment, effective November 1, 2015, would result in a ten (10) level enhancement in Amy's 2B1.1 adjustment for a loss exceeding $150,000 but less than $250,000 and not the twelve (12) level enhancement as currently calculated, thereby reducing her guideline range, assuming she receives three (3) levels for acceptance of responsibility, to 18-24 months.

The Sixth Circuit has repeatedly held that a District Court may consider pending Guidelines amendments in fashioning an individual's sentence. *See United States v. Atkinson*, 354 Fed.Appx. 250, 253 (6th Cir.2009) (unpublished decision) ("While it appears that [the relevant] amendment will be found not to have retroactive application, adoption of this change is something that the district court could have considered in its discretion."); *See United States v. Johnson*, 648 F.3d 417, 425 (6th Cir. 2011) ("We now make explicit what we suggested in *Atkinson* and join a number of our sister circuits in holding that the district court can consider

subsequent amendments to the Guidelines for purposes of fashioning an appropriate sentence under the § 3553(a) factors.")

## XI.   Fed. R. Crim. P. 32, Sentencing and Judgment (Allocution)

Fed. R. Crim. P. 32(i)(4)(A) states in pertinent part:

(4) Opportunity to Speak.

> (A) By a Party.  Before imposing sentence, the court must:
>
> (i) provide the defendant's attorney an opportunity to speak on the defendant's behalf;
>
> (ii) address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence; . . .

## XII.   Conclusion and Wherefore

Pursuant to 18 U.S.C. § 3553(a), at the time of sentencing this Honorable Court is called upon to fashion a sentence that is "sufficient, but not greater than necessary," by considering the "nature and circumstances of the offense and the history and characteristics of" Amy, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct", and "the need to provide restitution to any victims of the offense."

WHEREFORE, Defendant Amy Belz, by and through undersigned counsel, and pursuant to Fed. R. Crim. P. 32(i)(4)(A), 18 U.S.C. § 3553, the advisory United States Sentencing Guidelines, and LCrR 32.2, respectfully and humbly moves this Honorable United States District Court to consider the below law, allocution and arguments of counsel and thereafter, consistent with the parsimony, and order a sentence of eight months home confinement, forty-eight months' probation and $232,407.48 in restitution.

Respectfully submitted,

/s/ Michael C. Hennenberg
MICHAEL C. HENNENBERG, Esq.
JUSTIN WITHROW, Esq.
Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2015 a copy of the foregoing was electronically filed. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system and all parties may access this filing through the Court's system.

/s/ Michael C. Hennenberg
MICHAEL C. HENNENBERG, Esq.
Counsel for Defendant